203 N.J. Super. 22 (1985)
495 A.2d 889
ROSE K. CROWE, A/K/A ROSE K. DE GIOIA, PLAINTIFF-RESPONDENT CROSS-APPELLANT,
v.
SERGIO DE GIOIA, DEFENDANT-APPELLANT CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1985.
Decided July 17, 1985.
*26 Before Judges FRITZ, GAULKIN and LONG.
Gary N. Skoloff argued the cause for appellant-cross respondent (Skoloff & Wolfe, attorneys; Laurie J. Fornabai, on the brief).
Anthony B. Vignuolo argued the cause for respondent-cross appellant (Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., attorneys; Messrs. Martin S. Goldin, Anthony B. Vignuolo and Leslie Jeddis Lang, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
This is the second chapter in the "palimony" case of Rose Crowe and Sergio De Gioia. In an earlier decision (Crowe v. De Gioia, 90 N.J. 126 (1982)) the Supreme Court affirmed the proposition that an unmarried person is not entitled to alimony; approved the trial judge's grant of preliminary relief to Mrs. Crowe based upon traditional equitable principles, and established the Superior Court, Chancery Division as the appropriate forum in which to pursue a suit to enforce a "palimony" contract.
The case arose as a result of a complaint filed by Rose Crowe in the Superior Court, Chancery Division seeking enforcement of an alleged "palimony" agreement and pendente lite relief against De Gioia. De Gioia answered the complaint substantially denying Crowe's allegations and resisted the application for interim relief. Judge Garrenger granted Crowe's pendente lite application. This was the issue which took the matter to the Supreme Court, which affirmed that decision, noting at the same time that the award of counsel fees was limited by R. 4:42-9.
Thereafter, the case was tried before Judge Garrenger who found the existence of a "palimony" contract, granted an award of monetary damages in Crowe's favor, ordered De Gioia to transfer title to the residence in Perth Amboy in which they *27 lived to Crowe and denied her application for counsel fees. This appeal ensued. Here De Gioia claims that Judge Garrenger erred in concluding that a contract existed between himself and Crowe, in ordering the turnover of the house and in awarding of damages in an amount which De Gioia characterizes as excessive. Crowe attacks the damages calculation as insufficient, claims that she should have been awarded an equitable share of De Gioia's property and maintains that she was entitled to counsel fees. Because we believe that Judge Garrenger carefully and thoughtfully applied the proper legal principles to the facts here presented and that his conclusions are supported by the evidence, we affirm.
The facts which gave rise to the filing of the complaint are as follows: Crowe and De Gioia met in 1960. At that time Crowe was 38 years old and living in an apartment in Perth Amboy with her seven children. She was separated from her husband who had deserted the family in late 1955 or early 1956. De Gioia was single, 26 years of age and working as the night manager in a motel. At trial Crowe alleged that within a few weeks she and De Gioia were living together; that he provided her with financial support, and that they remained together until 1980 when he moved from the home which he purchased for them at 40 Lewis Street in Perth Amboy. She also claimed that she cared for De Gioia's personal needs and worked for him in his business and that she was his constant companion over the twenty years of their relationship. She maintained that De Gioia held her out as his wife and that they appeared together at many functions with both of their families. Crowe also alleged that when De Gioia announced that he was leaving he promised her a trust fund, the deed to the Lewis Street house, a new furnace, a summer home, a 185 acre farm in Maine, a half interest in another property in Maine, and the beneficial interest in a life insurance policy. In addition, she said that he promised her $300 per week in support.
De Gioia denied these claims and told a very different story. He testified that he never cohabited with Crowe or held her out *28 as his wife and asserted that he always kept a separate residence at the various motels he managed during the course of their relationship. He denied having provided Crowe with any financial support during the times that he did not see her and maintained that his purchase of the Lewis Street home in his own name reflected his intention to retain ownership of the home. He also denied that Crowe aided in his business and denied having promised Crowe anything upon the termination of their relationship.
The evidence established that from 1962-1969 De Gioia and Crowe spent their summers together managing the "Hollywood Hotel" in Rio Grande, New Jersey, that De Gioia apparently received most of his personal mail at the Lewis Street address, and that his drivers license and auto registration listed this as his residence. At the time of trial Crowe was 63 years old and claimed to be unskilled, unemployable and in poor health. De Gioia had, by then, married a younger woman.
Judge Garrenger concluded that Crowe and De Gioia cohabited together over the 20 years of their relationship and that De Gioia expressly promised to take care of Crowe for the rest of his life:
I believe Mr. De Gioia certainly intended to maintain relationship with Mrs. Crowe right up to and including 1980. Did he cohabit? Yes. I think he cohabited in the context of this case.
Mr. De Gioia, the very nature of his business makes it difficult for him to cohabit with anyone on a daily basis. He was forced to work nights much of the time. He admittedly maintained a residence or  not a residence  but a room at these hotels for his own convenience.
Many  much of the time he spent with Mrs. Crowe was during the day, but that still doesn't mean he wasn't cohabiting. That's where he hung his hat most of the time during these twenty years.
We have some pictures also to substantiate that  him in smoking jacket at the Lewis Street address. I have enough credible evidence to find that as much as this man was able to cohabit with anyone, he did in fact cohabit with her.
Do I find that there was an express promise rather than an implied promise, or no promise at all? I believe there was an express promise. I so find.
I think that it's quite clear that this woman did not spend twenty years of her life socializing with this man, cooking for him, being his sex partner, without some type of express promise being given to her.

*29 I think it's very credible that she inquired as to what her future would be. She was totally dependent on Mr. De Gioia. and I do find he made an express promise.
What was that express promise? I don't think that Mr. De Gioia ever said to Mrs. Crowe that you were entitled to half of everything I have. I don't think that her testimony is even very strong on that particular point.
She really had little to do with his business affairs. I don't find that she was a help-mate in these business affairs. I don't really buy the "sewing sheets" argument.
She may have stopped by there once in a while to help. I don't think Mr. De Gioia ever intended to let her have half of everything, and I do so find, but I do find that Mr. De Gioia did in fact promise to take care of Mrs. De Gioia [sic] for the rest of his life, he promised.
And I think his actions showed, too, that he intended for her to have the 40 Lewis Street property. And I think he intended it to be in good condition. I think he certainly intended to provide for her medical needs, utilities, mortgage payments, so on and so forth.
Thereafter Judge Garrenger ordered the Lewis Street property transferred to Crowe and calculated a lump sum award for Crowe in the amount of $155,642.63. He reached this number by determining an annual support figure, multiplying it by Crowe's life expectancy and discounting the lump sum to present value.
Kozlowski v. Kozlowski, 164 N.J. Super. 162 (Ch.Div. 1978) aff'd 80 N.J. 378 (1979), the seminal palimony case in New Jersey, is the framework for determining the propriety of Judge Garrenger's actions. In Kozlowski, the trial judge was faced with a question which he posed this way:
The dilemma may be simply stated: Is there any remedy available under our law for a woman who has devoted 15 or more years living with a man, for whom she provided the necessary household services and emotional support to permit him to successfully pursue his business career and for whom she has performed housekeeping, cleaning and shopping services, run the household, raised the children, her own as well as his, all without benefit of marriage; a woman who was literally forced out of the household with no ongoing support or wherewithal for her survival? [164 N.J. Super. at 170.]
He concluded that Mr. Kozlowski had made an oral promise in 1968 to support Mrs. Kozlowski (the parties coincidentally shared the same last name) for the rest of her life and that in consideration of the promise she had performed the agreed to services for 15 years and relinquished other career or employment *30 possibilities which would have provided for her future support and retirement income. The judge therefore awarded Mrs. Kozlowski a sum equal to the present value of the reasonable annual support payable for her life expectancy. The Supreme Court essentially affirmed the trial judge's decision and found that the parties had an express agreement that Mr. Kozlowski would provide for Mrs. Kozlowski for the rest of her life:
Parties entering this type of relationship usually do not record their understanding in specific legalese. Rather, as here, the terms of their agreement are to be found in their respective versions of the agreement, and their acts and conduct in light of the subject matter and surrounding circumstances. [80 N.J. at 384; citations omitted.]
The court held that "... agreements by adult nonmarital parties which are not explicitly and inseparably founded on sexual services are enforceable" (80 N.J. at 385) and relied on this language from Marvin v. Marvin, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976):
In summary, we believe that the prevalence of nonmarital relationships in modern society and the social acceptance of them, marks this as a time when our courts should by no means apply the doctrine of the unlawfulness of the so-called meretricious relationship to the instant case. As we have explained, the nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice. [80 N.J. at 385 quoting Marvin, supra, 18 Cal.3d at 683, 134 Cal. Rptr. at 831, 557 P.2d at 122.]
The court further quoted Hewitt v. Hewitt, 62 Ill. App.3d 861, 20 Ill.Dec. 476, 380 N.E.2d 454 (App.Ct. 1978), rev'd, 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (Sup.Ct. 1979) for "a philosophy with which we [the New Jersey Court] agree":
The value of a stable marriage remains unchallenged and is not denigrated by this opinion. It is not realistic to conclude that this determination will "discourage" marriage for the rule for which defendant contends can only encourage a partner with obvious income producing ability to avoid marriage and to retain all earnings which he may acquire. One cannot earnestly advocate such a policy. [80 N.J. at 387-388 quoting Hewitt, supra, 20 Ill.Dec. at 482, 380 N.E.2d at 460.]
Finally, the court approved the trial judge's calculation of contract damages as a lump sum equal to the present value of *31 support payments over plaintiff's life expectancy, based on the tables referred to in R. 1:13-5. Id., 80 N.J. at 389.
De Gioia claims that this case falls outside the scope of the reasoning of Kozlowski because neither the evidence in this record nor Judge Garrenger's findings support the existence of a contract. He first advances the argument that there was insufficient consideration for the alleged promise. But the amount and sufficiency of consideration is not significant, so long as it is the bargained for detriment actually intended as such between the parties. 1 Williston Contracts (3d ed. 1957), § 100 at 371. Such consideration is what separates contracts from gifts or gratuitous promises. Courts do not require that the detriment incurred be equal to the benefits received. Friedman v. Tappan Development Corp., 22 N.J. 523 (1956). Judge Garrenger found ample consideration here, noting that for twenty years Crowe provided a home, cooked for De Gioia and was his social companion. While conceding these findings, De Gioia claims that to the extent that Judge Garrenger concluded that Crowe's "meretricious" sexual services served as a consideration for De Gioia's promise, Kozlowski precludes recovery. The language on which De Gioia relies for this view is Judge Garrenger's conclusion that:
I think that it's quite clear that this woman did not spend twenty years of her life socializing with this man, cooking for him, being his sex partner, without some type of express promise being given to her.
Nothing in Kozlowski support this view. There, as here, "the illicit equivalent of marital bliss" (164 N.J. Super. at 167) was part and parcel of the relationship between the parties. There, as here, ample evidence of the plaintiff's other nonmeretricious consideration was adduced, and the sexual services were not "explicitly and inseparably" the basis of the promise. As such, nothing in Kozlowski would bar relief to Crowe.
De Gioia further alleges that Judge Garrenger could not find in the relationship certain "crucial factors" required under Kozlowski: (1) that Crowe acted as a helpmate in his business; (2) that De Gioia promised to share his assets with her, and (3) *32 that De Gioia held Crowe out to his business associates as his wife. Failing such findings he urges that a Kozlowski finding is precluded. De Gioia misreads Kozlowski in advancing these arguments. It is true that Judge Garrenger rejected any finding that Crowe actively worked alongside De Gioia in his business, finding instead that the evidence to that effect had been fabricated by the parties "to have the public subsidize part of this relationship." But Kozlowski, does not require a plaintiff to actively aid a defendant in his or her business. Indeed, the trial judge in Kozlowski expressly found that the plaintiff had not acted in defendant's business and yet affirmed the existence of a contract there.
It is also true that Judge Garrenger found that De Gioia did not promise Crowe a share in his business assets. He did find however that De Gioia promised to take care of Crowe for the rest of her life. This is, in fact, the exact promise considered and found valid in Kozlowski. Judge Garrenger also found that De Gioia "held [Crowe] out as maybe not his wife, but certainly somebody who was very important to him in his life." While the defendant in Kozlowski held the plaintiff out as his wife (which was easy to do since the parties shared the same last name), it is clear that this "holding out" is not an element of a "palimony" action. The court in Kozlowski noted the prevalence of nonmarital relationships in our society and stated that "an agreement between adult parties living together is enforceable to the extent it is not based on relationship proscribed by law, or on a promise to marry." 80 N.J. at 387. So long as neither of these prohibitions is violated, it is clear that the court intended to enforce agreements between unmarried parties irrespective of how they presented their relationship to the world. Indeed, to require that the parties hold themselves out as husband and wife as an element of a palimony action cuts close to the elements of common law marriage, such actions having been disallowed by N.J.S.A. 37:1-10.
*33 Finally, De Gioia claims that this record did not support a finding of cohabitation. It is important to note however that Judge Garrenger found that Crowe and De Gioia cohabited "in the context of this case":
Mr. De Gioia, the very nature of his business makes it difficult for him to cohabit with anyone on a daily basis. He was forced to work nights much of the time. He admittedly maintained a residence or  not a residence  but a room at these hotels for his own convenience.
Many  much of the time he spent with Mrs. Crowe was during the day, but that still doesn't mean he wasn't cohabiting. That's where he hung his hat most of the time during these twenty years.
Black's defines cohabitation as:
To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations [Black's Law Dictionary at 236, (5th ed. 1979).]
We agree with Judge Garrenger that given De Gioia's business, he could not have cohabited with Crowe any more completely even if they had been married. The evidence shows that she cooked and maintained the home for him, even after all but her youngest child left her. She aided in his shopping and acted as his companion in many of his social and business functions, including several family weddings. Judge Garrenger's conclusion respecting cohabitation like his conclusion respecting the existence of a promise to support is underpinned by adequate, substantial and credible record evidence. Any paucity in factual findings supporting these conclusions may be credited to the obviousness of such facts in the record. In such case, we will not interfere with them. See Rova Farms Resort v. Investor's Ins. Co., 65 N.J. 474 (1974).
De Gioia next challenges Judge Garrenger's order requiring him to transfer the house to Crowe. A contractual agreement to convey property, if based on valid consideration, is subject to the same performance as an agreement to provide support. De Gioia asserts however, that any agreement as to the conveyance of the Lewis Street property is in violation of the New Jersey Statute of Frauds, N.J.S.A. 25:1-5. This contention was addressed and rejected in Kozlowski. Moreover, as *34 Judge Garrenger found, Crowe fully performed her end of the agreement prior to De Gioia's assertion of the Statute of Frauds. As the court in Klockner v. Green, 54 N.J. 230 (1969) noted, "a Statute of Frauds should not be used to work a fraud." (At 236.) When performance by one party has occurred, the contract will be specifically enforced if to do otherwise would work an inequity on the party who has performed. Ibid. The court added:
Nevertheless, to obtain specific performance, as is requested here, more than just full performance by plaintiffs is necessary. As stated in Cooper v. Colson, 66 N.J. Eq. 328, 332 (E. & A. 1904), that performance must be in some respects of an exceptional character, and it must be obvious that not only did the parties not intend to measure the services by ordinary pecuniary standards, but that also the services are of such peculiar character that it is impossible to estimate their value by any standard. [54 N.J. at 237; citations omitted.]
In our opinion, Crowe's actions are of just the sort of exceptional character to mandate specific performance of the contract. Crowe's daily activities as a companion and housekeeper are of such a nature that they cannot easily be assigned a monetary value. Therefore we will not allow the Statute of Frauds to be used as a bar to the relief to which Crowe is entitled as a result of the full and exceptional performance of her bargain with De Gioia.
Nor do we view as meritorious De Gioia's claim that the purchase of the property in his own name precludes the conclusion that he promised to convey it to Crowe. The name in which the house was held is essentially irrelevant to an equitable action such as this. This record was replete with evidence of De Gioia's promise to convey the house. Moreover, it is clear that Judge Garrenger properly considered the written promise to convey in the will not as the contract itself but as evidence in support of Crowe's claim that the parties had an agreement that she would keep the home.
Both parties challenge the methodology utilized by Judge Garrenger in calculating the lump sum figure. Judge Garrenger followed the dictates of Kozlowski and determined a yearly support figure of $14,300 ($275 X 52). He then sought *35 to determine the present value of this payment if continued throughout Ms. Crowe's life expectancy. Thereafter he multiplied the $14,300 figure by the present value factor found in the appendix to the court rules and referred to in R. 1:13-5. This factor for a 61 year old woman was 10.8841 which resulted in a total figure of $155,642.63, net of taxes. Judge Garrenger did not entertain any expert testimony as to the correctness of this amount. De Gioia challenges the award because the interest factor in the annuity tables is 5 1/4%, and the interest rate on most accounts is now in excess of 10%. This results in a distortion in the effect of the present value table in Crowe's favor. Crowe challenges the award because it does not consider the effects of the increase in the cost of living due to inflation. We agree that there is merit in both of these positions and that it would have been more accurate in light of fluctuating financial realities to take expert testimony in order to ascertain what amount would ultimately provide Crowe with the true present value of future support payments. However, in Kozlowski the Supreme Court expressly mandated the precise method of calculating damages followed by Judge Garrenger. We therefore find no grounds for reversal based on the judge's methodology.
Additionally, Crowe alleges that Judge Garrenger erred in determining her needs at $275 per week when she actually required $500. In Kozlowski the Supreme Court held that the award should reflect "the reasonable future support defendant promised to provide." 80 N.J. at 388. In this case Crowe indicated that De Gioia told her that he would "take care of [her] in the style that we were living...." The determination of Crowe's financial needs in order to maintain her lifestyle is within the sound discretion of the trial judge and should only be reversed if it constitutes an abuse of that discretion. See e.g., Martindell v. Martindell, 21 N.J. 341 (1956). On this record, we are satisfied that Judge Garrenger's analysis of Crowe's *36 needs was a reasonable one, that it was based upon the record and upon his experience in similar matters and that it should not be disturbed.
Crowe also challenges the failure of Judge Garrenger to provide her with "equitable distribution" of De Gioia's property. She claims that it is within the trial court's equitable power to provide a division of De Gioia's property based on the presumption "that the parties intended to deal fairly with each other" on the dissolution of their relationship. Marvin v. Marvin, supra, 134 Cal. Rptr. at 830, 557 P.2d at 121. Crowe relies heavily on Justice Pashman's concurrence in Kozlowski in this respect:
As the majority emphasizes, these agreements may be express or implied ... At bottom, courts must determine the intent or understanding of the parties as to whether, and to what extent, their assets and income are to be divided. This intent may be discerned from their explicit language, as in the present case, or from their conduct and actions interpreted in light of all the surrounding circumstances. Regardless of the precise manner in which the parties manifest agreement, however, it is their reasonable expectations that must be honored. And the Court may look to a variety of remedies to protect that expectation. [80 N.J. at 390; citations omitted.]
Justice Pashman observed that to reach this end the court should be willing to base recovery on quantum meruit or to employ equitable remedies such as constructive or resulting trusts. This equitable approach received further support in the Supreme Court's initial opinion in this case. There, in affirming Judge Garrenger's decision to award Crowe pendente lite support payments, the court stated:
Furthermore, the inability to fit plaintiff's claim for temporary relief into the conventional category of a matrimonial action is not a bar to relief. To achieve substantial justice in other cases, we have adjusted the rights and duties of parties in light of the realities of their relationship. See, e.g., McGlynn v. Newark Parking Authority, 86 N.J. 551, 559 (1981); State v. Shack, 58 N.J. 297, 307 (1971). Increasing numbers of unmarried couples live together.... Although plaintiff need not be rewarded for cohabiting with defendant, she should not be penalized simply because she lived with him in consideration of a promise for support. Our endeavor is to shape a remedy that will protect the *37 legally cognizable interests of the parties and serve the needs of justice. See generally Restatement (Second) of Contracts, § 359 at 169 (1981). [90 N.J. at 135.]
But here Judge Garrenger concluded that Crowe and De Gioia had an express agreement that she would "be taken care of," and that this agreement did not extend to any claim by Crowe against De Gioia's other assets. Thus Judge Garrenger enforced the contract between the parties in accordance with its express terms and his failure to provide Crowe with additional assets cannot be faulted. As Justice Pashman observed in Kozlowski equitable remedies are required where traditional remedies will not suffice but "[i]n the present case, no resort need be had to such remedies inasmuch as an explicit agreement did exist." (90 N.J. at 135.) We note in passing that Crowe appears to be seeking some form of equitable distribution as would occur in the dissolution of a marriage. That claim on its face has no place in this hybrid action, the dimension of which have been clearly delineated by the Supreme Court.
We turn next to the troublesome question of counsel fees. Crowe claims that Judge Garrenger erred in denying the award, especially in light of the enormous fees which have been generated. Judge Garrenger clearly felt that the award of fees would have been appropriate but concluded that he could find "absolutely ... no statutory authority to give [her] a fee in this particular case." In a later opinion, he elaborated:
I am very torn by the counsel fee. I can appreciate the fact the amount of money I've awarded Mrs. Crowe really doesn't consider a counsel fee in it.
In other words, I have fairly tried to judge her needs as against her life expectancy, and I've really, I honestly don't think I've put any grass in there. I think there was a lot of grass in the $500 a week, but I don't think there's much grass in what I've ordered, and obviously Mr. Goldin is entitled to be paid. He's done a lot of work on this particular file.
If this was a marriage situation, he certainly would get a counsel fee in this particular case based on a number of factors, A, the fact that he was forced to try the case because Mr. De Gioia would not concede his position, and he won, at least he's won so far.

*38 No. 2, the parties have a very unequal economic situation.
No. 3, I don't think Mrs. Crowe can afford to pay Mr. Goldin, but I don't see any authority for me to award a counsel fee in this case. The only thing I can possibly hang my hat on is that this is a Court of Equity and equity cries out for Mr. De Gioia to pay Mr. Goldin's counsel fee.
The Court rules are quite specific as to the award of counsel fees. R. 4:42-9(a)(1) states:
4:42-9. Counsel Fees
(a) Actions in Which Fee is Allowable. No fee for legal services shall be allowed in the taxed costs or otherwise, except
(1) In a family action, the court in its discretion may make an allowance both pendente lite and on final determination to be paid by any party to the action, including if deemed to be just any party successful in the action, on any claim for divorce, nullity, support, alimony, custody, visitation, equitable distribution, separate maintenance and enforcement of interspousal agreements relating to family type matters.
This rule was originally strictly interpreted to deny even a spouse's fees for the resolution of property questions attendant on the dissolution of a marriage. See Pressler, Current N.J. Court Rules, Comment R. 4:42-9 (1984). Now such fees are granted on property issues related to a divorce. Chalmers v. Chalmers, 65 N.J. 186 (1974). In 1983 the rule was changed again in connection with the new rules for the Family Part to include "family type matters." One reading of the new rule is that the language was revised with the intent to include the award of fees in a case such as this, although the comments to the rule reject such a view and conclude that "[t]he intent of this amendment is to permit counsel fee awards in family actions only to the extent previously permitted by R. 4:75." Pressler, Current N.J. Court Rules, Comment R. 4:42-9 at 810. Moreover, the Supreme Court's prior decision in this case sheds some light on the approach to be countenanced here:
In addition, we disapprove the allowance of costs and counsel fees in an application for temporary relief in an action for support between unmarried cohabitants. In general, counsel fees may not be awarded except as expressly provided by R. 4:42-9. Although that rule permits the allowance of counsel fees pendente lite in a matrimonial action, R. 4:42-9(a)(1), no such provision exists in a non-matrimonial action. [90 N.J. at 136.]
*39 Crowe argues that this language should be limited to a pendente lite award of fees, since the purpose of any pendente lite "palimony" award is to preserve the status quo and not a determination on the merits of the claim. But the Supreme Court has expressly determined that a "palimony" action is a contract action under R. 4:42-9 and does not fit into the matrimonial or family part exception to the rule, and there is no evidence that this determination was to be limited to pendente lite fee applications.
Crowe finally argues that the decision in Red Devil Tools v. Tip Top Brush Co., Inc., et al., 50 N.J. 563 (1967), an action for common law unfair trade practices, supports her position as to fees. There, the Supreme Court approved an award of counsel fees as an element of plaintiff's damages, saying:

R.R. 4:55-7 [now R. 4:42-9] governs the allowance of counsel fees generally but in the light of its history is justly to be viewed as not standing in the way here. Cf. R.R. 1:27A. [now R. 1:1-2]. It was specifically adopted in response to abuses which were well-known and need not be recounted. [At 576.]
The Red Devil court further indicated that the rule against an award of counsel fees may be inapplicable "where its historical goal would not be defeated or impaired." Ibid. The rule against counsel fees was imposed because such fees were uniformly awarded in the Chancery courts prior to the 1947 constitution, with the result that parties were afraid to commence litigation for fear that a counsel fee might be levied against them, and because the discretionary award of fees appeared to foster favoritism. See Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167 (1960). In this case Crowe argues that counsel fees could be awarded as part of the remedy in light of De Gioia's refusal to live up to a contractual obligation without reviving the abuses of the former Chancery practice. The analogy to a traditional matrimonial action in this connection supports her view. While we believe that the question of counsel fees could easily be resolved either way on a rule construction basis, and that on equitable balancing Crowe *40 would be entitled to such an award, it is our view that in light of the language in Crowe I, it is for the Supreme Court to resolve this issue. Accordingly, we affirm the denial of fees by Judge Garrenger.
We note finally the philosophical argument raised by De Gioia in his brief and ably presented by his counsel at oral argument: that the application of the Kozlowski lump sum damages payment rule in this case and, indeed in every case, has the effect of putting a "palimony" cohabitant in a better position than a spouse at the end of a matrimonial action. Underpinning this argument is the inherent value of a lump sum in hand, as opposed to a pay-out, the fact that no future litigation is necessary in order to secure periodic payments and that the future financial circumstances and life expectancy of the payor cannot depreciate the award. These are all realities and it is true that most matrimonial litigants would consider themselves blessed to receive a lifetime of "support" payments on the day of the divorce, assured that no actions to enforce litigant's rights are forthcoming and that the death or financial ruin of the payor is essentially an irrelevancy to future financial planning. On the other hand, it can be argued that the palimony cohabitant cannot seek an increase in payment based upon changed circumstances, has no right to equitable distribution and lives every day of the cohabitation without the protections accorded a married individual including the benefits of the social security system, the guarantees contained in the laws on descent and distribution and even the shield of the marital privilege, to name a few. We assume that the Supreme Court in Kozlowski balanced these considerations and, recognizing the potential "inequities" flowing from the contract theory of "palimony" damages, nevertheless determined the viability of this approach. It is not for us to adjudicate the correctness of this policy judgment.
Affirmed.